(C.D. 2179)

ALASKA FISH OIL EXTRACTORS, INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 24, 1960)

*Lawrence & Tuttle* (*Barnes, Richardson & Colburn* by *George R. Tuttle, Hadley S. King, Joseph Schwartz, Edward N. Glad,* and *George R. Tuttle, Jr.,* of counsel) for the plaintiff.

*George Cochran Doub,* Assistant Attorney General (*Mollie Strum, Richard E. FitzGibbon, Daniel I. Auster,* and *Sheila N. Ziff,* trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar consists of oil derived from the livers of whales. The whale liver oil in question was classified under paragraph 34 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at the rate of 5 per centum ad valorem as drugs, "advanced in value or condition," by certain processes therein described beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture.

Plaintiff claims the merchandise properly free of duty under paragraph 1669 of the Tariff Act of 1930, as modified by T.D. 51802, *supra*, as drugs in a "crude" state, not advanced in value or condition by the processes described in said paragraph beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture.

The pertinent parts of the provisions of the tariff act under consideration are as follows:

Paragraph 34 of the Tariff Act of 1930, as modified by T.D. 51802, *supra*:

Drugs, such as barks, * * * and all other drugs of vegetable or animal origin (except halibut-liver oil) ; any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol_____ 5% ad val.

Paragraph 1669 of the Tariff Act of 1930, as modified by T.D. 51802, supra:

Drugs such as barks, * * * and all other drugs of vegetable or animal origin; all the foregoing * * * which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, and not containing alcohol_____ Free

At the trial, two witnesses testified on behalf of the plaintiff. There were further offered and received in evidence two depositions directed mainly toward establishing the commercial unfeasibility of producing whale oil in the United States, and further reciting the process by which the imported whale liver oil was obtained from the whale livers (plaintiff's collective exhibit 1 and plaintiff's exhibit 2). The Government introduced no testimony at the hearings herein.

Dr. George T. Reeve, the holder of a degree in medicine and secretary-treasurer of Washington Laboratories, Seattle, Wash., testified that his company had manufactured vitamins and fish oils derived from fish livers since 1940; that he had been with the company since 1946; and that, for the past 10 years, the extraction from fish livers of oil containing vitamin "A" by his company had been under his supervision. Dr. Reeve stated that, over a period of 10 years, the amount of fish oil extracted from whale livers by his plant did not exceed 20,000 pounds (R. 8); that the method used by his company in the processing of whale liver to get any degree of recovery of the fish oil containing vitamin "A" was unsatisfactory and "not adequate to pay a reasonable price for the raw material"; that it was not "economical and feasible to carry on and process whale liver as such" because "the recovery of the oil was so small"; and that it "was not sufficient to pay the producer a fair per pound price * * * at a profit." (R. 10.)

On cross-examination, Dr. Reeve stated the whale livers which were used in his plant, as heretofore noted, came from Fields Landing, Calif., and also from B.C. Packers, Vancouver, and that his company also received samples of whale livers from Japan, which varied anywhere from a quart size to a tin size, containing 40 ounces (R. 12-13). It appears that the whale liver itself weighs approximately 800 pounds.

Describing the so-called "alkali" digestion process used by his company in the extraction of oil from whale livers, the witness testified as follows:

Well, the alkali digestion process is where the liver, after it is received in a frozen condition, was thawed, ground, and put into large digestion tanks. To that, water was added, approximately one part of liver to four parts of water and it was heated to approximately 80 degrees by steam centigrade. Then, to

that, the alkali was added to the tank, bringing it up to a P.H. of 10 to 12 and the mix was stirred there for approximately one or two hours, allowed to settle out overnight generally and the free oil settles to the top, which was skimmed from the tank. This resulting oil was then neutralized and washed and centrifuged and then it was what we refer to as crude liver oil. [R. 14.]

Dr. Reeve stated that the average percentage of oil obtained by his company from whale livers was a percentage determined by the weight of the liver and that whale liver contains about 5 per centum oil, depending upon the amount of fatty acid present in the oil (R. 15). It appears, in this connection, that the whale livers were refrigerated when his company received them, being salt free (R. 15). He further testified that the Washington Laboratories does not sell whale liver oil and that, so far as he knew, there are no laboratories which produce whale liver oil in the United States (R. 16–17).

Raymond B. Mattson, vice president in charge of the northwest operations of Wilbur-Ellis Co., which concern was engaged in the vitamin "A" oils and fish-liver business with offices in Tokyo, Buenos Aires, New York, Chicago, Vancouver, Seattle, and San Francisco, testified that he was familiar with the processing of fish livers in the United States to obtain vitamin "A" oil, having gained a knowledge of the processes employed in such operation by acting as sales representative for purchasers of livers for the purpose of rendering them into vitamin "A" and "D" oils (R. 25). Such purchasers included the Washington Laboratories, Erling-Weeks & Co. in California, Western Chemical Industries, Ltd., and Canada Fishing Co. in Vancouver, and Lyle-Branch Flour Co. in Seattle. He stated that he was also familiar with the types of livers used in the United States in the production of vitamin "A" oils and that, to his knowledge, whales have never been used in the United States for the production of vitamin "A" oil, nor have whale livers been imported into this country for such purpose.

Plaintiff's collective exhibit 1 is a deposition of Ryohei Hayashi, an employee of Nippon Suisan Kabushiki Kaisha, shipper of the seven drums of whale liver oil here involved. The record discloses that Mr. Hayashi has been connected with the shipper since 1939 and that, with the exception of the years 1955–1956, he had participated in all whaling expeditions of the company since the end of World War II, in which connection he had supervised the processing of the whales to obtain the whale liver oil. Mr. Hayashi described the processing of whale livers to obtain the imported whale liver oil as follows:

First the skin, blubber and ribs are removed. Then the internal organs are pulled out by a winch. The livers are cut away from the other internal organs. Next the livers are sliced into pieces about an inch thick and one foot square. After the skin and blood vessels are removed from the livers they are dropped from the deck to the factory. In the factory the pieces are cut into smaller pieces and then they are chopped up. After being chopped they are put in a cooker where caustic soda is added and they are cooked for about two hours at

about 90 degrees centigrade. During this time they are agitated. About 4 to 5 percent caustic soda by weight is added. After being completely pulverized pollock liver oil is added as what we call "pick up oil". After about 30 minutes the vitamin A from the whale liver has been picked up by the pollock oil. The oil is then separated from the residue by a Sharpless centrifugal separator. Next the oil is placed in a Delaval centrifugal separator to separate the oil from any remaining moisture and impurities. After that the oil is poured into drums and it is then ready for commercial use. [Page 3, plaintiff's collective exhibit 1.]

It appears from the record that the Japanese whaling operations are carried out in the Antarctic and the Arctic, and also in the coastal waters around Japan, certain "mother ships" being used in the whaling expeditions. As disclosed by the deposition of Mr. Hayashi, the percentage of oil usually recovered from the whale livers processed on the mother ship is about 3 to 5 per centum of the weight of the livers.

There were also received in evidence certain answers to the deposition of Mr. Junichi Kishimoto, who, as a member of the foreign affairs department of the exporter, had charge of the shipment of the involved merchandise. He testified that he was familiar with the production of whale liver oil and that the oil in whale livers is about 3 to 5 per centum of the total weight of the livers, confirming, to such extent, the testimony of plaintiff's previous witness (R. 41).

Plaintiff contends that the oil in question is the "crudest" form of the drug imported into the United States and that any grinding or other process applied to the drug prior to importation was essential to the separation of the "drug" from the whole liver for the proper packing and the prevention of decay or deterioration of the drug pending manufacture.

The Government, maintaining that the imported oil represents an advancement over the liver "which is the crude drug," contends that the processing of the whole "livers" to obtain the whale liver "oil" in the case at bar (as described in plaintiff's collective exhibit 1 by witness Hayashi) is essentially the same type of processing as took place in the case of the fish livers previously under consideration by this and our appellate court. See *Geo. S. Bush & Co., Inc., et al.* v. *United States,* 42 C.C.P.A. (Customs) 190, C.A.D. 592; *Eastman Kodak Company* v. *United States,* 41 C.C.P.A. (Customs) 114, C.A.D. 539; *Geo. S. Bush & Co., Inc.* v. *United States,* 32 C.C.P.A. (Customs) 56, C.A.D. 285; *Wilbur-Ellis Company* v. *United States,* 27 Cust. Ct. 317, Abstract 55884; and *Ralston Purina Company* v. *United States,* 40 Cust. Ct. 407, Abstract 61435, in all of which cases the involved merchandise was held to be drugs, "advanced."

Plaintiff's counsel, in the case at bar, directs our attention to the case of *United States* v. *Judson Sheldon Corp.,* 33 C.C.P.A. (Customs) 73, C.A.D. 318, wherein certain beef liver extract in paste form was held free of duty as a crude drug. That case, however, is distinguishable from the case at bar, and the holding therein is not decisive of the

classification of the merchandise here imported. The merchandise involved in the *Judson* case, *supra*, was extracted from beef livers consumed as meat food in the United States and imported for that purpose. The livers were, therefore, meat, and not drugs, the court citing, in this connection, *F. W. Myers & Co., Inc.* v. *United States*, 29 C.C.P.A. (Customs) 30, C.A.D. 167. The appellate court, in the *Judson* case, *supra*, concluded that, in the process there described, a crude drug first appeared when the soluble portion of the liver was extracted. The court stated, however, that this finding did not mean that the court would or would not entertain a different view or arrive at a different conclusion if the livers from which the extract there in question was taken had in fact been a crude drug. The whale livers in the case at bar, unlike those involved in the *Judson* case, *supra*, and like the shark and other fish livers in the cases above cited, are "drugs," and not meat, thus distinguishing the facts in the case at bar from those in the *Judson Sheldon Corp.* case, *supra*.

Plaintiff contends that the small percentage of oil contained in the whale liver indicates that the whale livers are not articles of commerce as such, and that, accordingly, the whale liver oil represents the "crude" drug. Plaintiff's witness Dr. Reeve agreed, however, that tuna "contains from 3 to 7 per cent" of oil (R.19). This court has held that tuna fish oil is properly classifiable as an advanced drug under paragraph 34, *supra*. *Dr. Salbro Emy* v. *United States*, 3 Cust. Ct. 437, Abstract 42416. It would appear, therefore, that the percentage of oil obtained from a fish liver is not the determining factor in considering the classification of a product as a "crude" or "advanced" drug.

The record discloses that whale livers, albeit indicated by plaintiff's witness Reeve as samples, were received by his company from Japan and Canada. These samples were "usually anywhere from a quart size to a tin size containing 40 ounces." The testimony indicates that a whale liver averages approximately 800 pounds (R. 12–13). The witness testified that these whale livers when received "had been refrigerated" (R. 15). Thus, the whale livers, the "crude" drug, had been subjected to a process of preservation and the whale liver oil obtained from the livers imported by the Washington Laboratories constituted the "advanced" drug. The record further discloses that the extracted oil obtained by the Washington Laboratories "was sold to the various pharmaceutical houses and stock and poultry feed dealers" (R. 8). It thus appears that whale livers had been and could be preserved for the purpose of future extraction of the whale liver oil, however unprofitable such extraction may have been for the importer of whale livers. The fact that only a "small" percentage of oil was or could be obtained in this country from imported whale livers does not, as heretofore indicated, constitute the livers the "crude"

drug. The fact of the matter is that the whale liver oil here imported was a drug, advanced in value or condition, by certain processes "beyond that essential to * * * the prevention of decay or deterioration pending manufacture," and was, therefore, an advanced drug. The record also discloses that the imported whale liver oil was not further advanced in this country. As stated by this court in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 26 Cust. Ct. 251, C.D. 1332 (affirmed in C.A.D. 592, *supra*), at page 266:

> * * * It may have been convenient or desirable for the exporters or shippers, from their viewpoint, to process the shark livers and export the extracted oil rather than the livers, but such considerations, whether economic, business, or for some other personal motive, of the exporters or shippers, are wholly immaterial toward determination whether a drug is in a crude state or in advanced condition.
>
> Processing the shark livers into the form of oil advanced the crude drug along the line of its ultimate manufacture. Treatment in Canada of the shark livers was not essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture. * * *

In the *Eastman Kodak* case, *supra*, our appellate court, at page 118, cited from the *Geo. S. Bush* case, *supra* (C.D. 1332, page 261), the following:

> Refrigeration, salting, and the use of chemical substances are recognized commercial methods for preserving dogfish livers. Each varies in degree of effectiveness, but none stops deterioration. Salting was characterized as a very inferior method of preservation. Freezing does not arrest deterioration but slows it down. The effective way of preserving the medicinal value of the drug is in the form of free oil, removed from liver tissue, because the oil contains chemical compounds, called antioxidants, with properties that protect vitamin A against destruction by exposure to air.

The court, in the *Eastman Kodak* case, *supra*, stated, page 120:

> It appears logical to us if the imported oil containing the vitamin is a drug then the liver which likewise contained the vitamin is also a drug. Clearly, the liver which is the drug is in a cruder condition than the oil which was extracted therefrom by the process hereinbefore described.

In our opinion, the same may be said with respect to the processing of the whale livers to obtain the whale liver oil here under consideration, namely, that the whale livers have been so advanced in value or condition by the processes herein described that the imported whale liver oil is a drug, "advanced," within the contemplation of paragraph 34 of the act, under which the involved merchandise was classified.

The classification made by the collector carries with it the presumption that the imported whale liver oil, in its condition as imported, is a natural and uncompounded drug of animal origin, not edible, which is "advanced in value or condition by shredding, grinding, * * * or any other process or treatment whatever beyond that essential to the proper packing of the drug[s] and the prevention of decay or de-

terioration pending manufacture, * * *." The imported oil containing the vitamin is a drug and, therefore, the liver from which the oil is processed and which likewise contained the vitamin is also a drug. It appears, therefore, that the whale liver, the crude drug, has been advanced in value or condition to obtain the whale liver oil. *Eastman Kodak Company* case, *supra*. Further, the plaintiff in this case has not, in our opinion, established that the whale livers used to obtain the imported oil have not been advanced by the processes employed beyond that essential to the proper packing of the drug and the prevention of decay or deterioration. The record shows otherwise. Accordingly, plaintiff's proof has failed to overcome the presumption of correctness attaching to the collector's classification.

On the basis of the record here presented and for the reasons heretofore stated, we hold the involved merchandise properly dutiable under paragraph 34 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at the rate of 5 per centum ad valorem as a drug, "advanced in value or condition," by certain processes beyond that essential to the proper packing of the drug and the prevention of decay or deterioration pending manufacture, as classified. The protest in this case is overruled.

Judgment will be rendered accordingly.